```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/14/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jingyuan Yang et al.,

                    Plaintiffs,

-against-

United States of America,

                    Defendant.

1:21-cv-06563 (SDA)

OPINON AND ORDER

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Pending before the Court are (1) a motion by plaintiffs Jingyuan Yang and Yan Li, individually and as parents and natural guardians of S.Y., an infant (collectively, "Plaintiffs"), pursuant to Rule 702 of the Federal Rules of Evidence, for an order excluding certain testimony of three expert witnesses retained by the United States of America ("Defendant" or the "Government"), *i.e.*, Dr. Michele Spencer-Manzon, Dr. Allan E. Rubenstein and Dr. Desmond Sutton (Pls.' 2/6/24 Not. of Mot., ECF No. 81), and (2) a motion by the Government, pursuant to Rule 702, for an order, excluding certain testimony of two experts retained by Plaintiffs, *i.e.*, Dr. Richard Luciani and Dr. Daniel Adler, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in the Government's favor. (Def.'s 3/15/24 Not. of Mot., ECF No. 89.)

For the reasons set forth below, the Rule 702 motions are DENIED WITHOUT PREJUDICE to renewal at trial and the Government's motion for summary judgment is DENIED.

**BACKGROUND**

I. **Background Facts**

In this Federal Tort Claims Act ("FTCA") case, which is a non-jury case,[1] Plaintiffs seek damages from the Government arising out of the labor and delivery of their infant son, S.Y., by Dr. Sandy Lau Bui, D.O., an employee of Charles B. Wang Community Health Center, Inc. ("CBWCHC"), a federally funded clinic.[2] (Compl., ECF No. 4, ¶¶ 8-18.) S.Y. was delivered by an emergency cesarean section procedure performed by Dr. Bui on December 6, 2019. (Def.'s 56.1 Stmt., ECF No. 91, ¶¶ 19-33; Pls.' 56.1 Resp., ECF No. 102, ¶¶ 19-33.) Plaintiffs allege that Dr. Bui and others employed by the CBWCHC were negligent and committed malpractice during the labor and delivery, and thereafter, which proximately caused S.Y. to sustain severe and permanent personal injuries, including a phrenic nerve injury and brachial plexus injury. (*See* Compl. ¶¶ 14, 16, 18.)[3]

II. **Plaintiffs' Experts**

Plaintiffs retained, and intend to call at trial as expert witnesses, Dr. Luciani, an obstetrics and gynecology specialist, and Dr. Adler, a pediatric neurology specialist.

---

[1] Plaintiffs are not entitled to a jury trial for their claims against the Government under the FTCA, *see* 28 U.S.C. §§ 1346(b)(1), 2402, which are the only remaining claims in this case.

[2] There is no dispute that Dr. Bui is deemed a Government employee for purposes of the FTCA. (*See* Def.'s 3/29/24 Opp. Mem., ECF No. 93, at 1.)

[3] Plaintiffs' Complaint also had named as a defendant The New York And Presbyterian Hospital, sued herein as New York-Presbyterian Healthcare System, Inc., doing business as New York-Presbyterian Lower Manhattan Hospital and New York Presbyterian Weill Cornell Medical Center ("New York Presbyterian"). (*See* Compl. ¶ 7.) However, the claims against New York Presbyterian previously were dismissed. (7/14/23 Order, ECF No. 63.)

### A. Dr. Luciani

Dr. Luciani's area of expertise is in obstetrics and gynecology. (Luciani Rpt., ECF No. 81-20, at 1.) In his expert report, dated February 10, 2023, Dr. Luciani opined that "the delivery process utilized by Dr. Bui was negligently performed and departed from accepted standards of care" and caused S.Y.'s injuries. (*Id*. at 19.)

Dr. Luciani stated that the appropriate standard of care for "dis-impaction of the fetal head when it is deeply engaged in the pelvis during a Caesarean section" was to use a procedure called the "push-up" method, the "reverse breech" or "pull" method, and "other less frequently used methods, none of which were used by Dr. Bui." (Luciani Rpt. at 19-20.) He stated that Dr. Bui used "excessive lateral traction . . . while removing the infant from the uterine cavity during the C-section delivery." (*Id*. at 20.) Dr. Luciani opined that this "excessive traction on the neck during delivery" caused S.Y. to suffer a "stretch injury" which, in turn, caused S.Y. to sustain a "right brachial plexus injury and right phrenic nerve injury with secondary poor Apgar scores, neonatal respiratory and cardiac failure and clinical hypoxic ischemic encephalopathy." (*Id*.) He further opined that the "excessive lateral traction utilized by Dr. Bui to deliver the head from the lower uterine segment . . . resulted in a change of the angle between the head and right shoulder that stretched the brachial plexus and phrenic nerve beyond their plastic limit, resulting in permanent injuries." (*Id*. at 21.) Dr. Luciani stated that "the method employed [by Dr. Bui] was excessively dangerous and departed from accepted standards of care." (*Id*. at 20.)[4]

---

[4] Dr. Luciani also submitted a rebuttal report, dated June 16, 2023, in which he responds to the report submitted by Government expert Dr. Sutton. (Luciani Rebuttal Rpt., ECF No. 77-21.)

### B. Dr. Adler

Dr. Adler's area of expertise is in pediatric neurology. (Adler Rpt., ECF No. 81-18, at 13.) In his expert report, dated February 17, 2023, Dr. Adler offered several opinions, including that "the injury to [the] right brachial plexus and right phrenic nerve of [S.Y.] occurred as a result of movement of his head created by Dr. Bui during the complicated cesarean section" (*id*.); that "the permanent brachial plexus injury suffered by [S.Y.] could not have occurred at any time other than while Dr. Bui moved the head during the cesarean section delivery" (*id*. at 13-14); that S.Y. never could be educated in a conventional classroom without support (*id*. at 18); that S.Y.'s "neurological injuries and disabilities will prevent him from ever being employed in the competitive job market" (*id*.); and that S.Y. "will not be able to live independently and will require lifelong supervision either at home or in a residential setting." (*Id*.)

## III. Government's Experts

The Government retained, and intends to call at trial as expert witnesses, Dr. Spencer-Manzon, a clinical geneticist; Dr. Rubenstein, a pediatric neurology specialist; and Dr. Sutton, an obstetrics and gynecology specialist with a subspecialty in maternal-fetal medicine.

### A. Dr. Spencer-Manzon

Dr. Spencer-Manzon is an expert geneticist. (Spencer-Manzon Rpt., ECF No. 81-1, at 1.) In her expert report, dated May 24, 2023, she opined that S.Y. has a congenital myopathy, which "is a large part of what is driving his current clinical phenotype." (*Id*. at 5.) Dr. Spencer-Manzon stated that S.Y. could have "a likely pathogenic variant in TTN,"[5] which could be affecting his

---

[5] "The TTN gene provides instructions for making a very large protein called titin. This protein plays an important role in skeletal muscles, which the body uses for movement, and in heart (cardiac) muscle." MedlinePlus, https://medlineplus.gov/genetics/gene/ttn/ [https://perma.cc/4U95-LC9T].

clinical phenotype in two ways: (1) S.Y. could have a second mutation not detected in previous genetic testing; or (2) the TTN gene found on genetic testing could have incomplete penetrance and affect S.Y., while his mother could be "a non-penetrant carrier" of the same variant. (*Id*.) She also opined that S.Y. could have "another congenital myopathy or a muscle-brain disorder given his global developmental delay." (*Id*.) Citing scientific studies indicating that "[m]ost neuromuscular conditions are thought to be genetic in origin," and that "[i]t is well established that a molecular diagnosis can only be made in less than 50% of congenital myopathies," she states that "it is very common for genetic testing to not be able to make a definitive diagnosis by itself," and that "[t]he lack of definitive mutations does not rule out a genetic cause" for S.Y.'s condition. (*Id*. at 6.) Dr. Spencer-Manzon recommended that S.Y. undergo additional testing and evaluations that were not reflected in the record "to further assess the likely cause of his condition." (*Id*. at 6-7.)

### B.  Dr. Rubenstein

Dr. Rubenstein is a Clinical Professor of Neurology and Pediatrics at the NYU Grossman School of Medicine who practices at NYU Langone Medial Center. (Rubenstein Rpt., ECF No. 81-3, at 1.) In his expert report, dated May 23, 2023, he opined that that there was no evidence in the record that S.Y. suffered from shoulder dystocia or other trauma that caused "traumatic palsies of the right brachial plexus or phrenic nerve," and there was "no evidence" for the assertion of Plaintiffs' expert Dr. Adler that S.Y. has "permanent neonatal brachial plexus injuries." (*Id*. at 6-7.) Rather, according to Dr. Rubenstein, S.Y. "suffered from a congenital musculoskeletal abnormality unrelated to his delivery," and a "respiratory failure at birth from a congenital musculoskeletal defect caused S.Y. to develop hypoxic-ischemic encephalopathy."

(*Id*.) Dr. Rubenstein further opined that "S.Y.'s clinical presentation at delivery and subsequent course [were] most likely due to a rare and complicated genetic abnormality, which may involve the TTN, MTM1[6] or other as yet unidentified neuromuscular genes." (*Id*. at 8.) Dr. Rubenstein stated that S.Y. had not undergone "sufficient genetic testing and other analysis to determine" the specific cause of his condition. (*Id*.)

### C.    Dr. Sutton

Dr. Sutton is board-certified in obstetrics and gynecology with a subspecialty in maternal-fetal medicine and currently serves as the Medical Director of Labor and Delivery at Mount Sinai West Hospital. (Sutton Rpt., ECF No. 81-7 at 1; Sutton Decl., ECF No. 95, ¶¶ 4-5.) In his expert report, dated May 24, 2023, he opined that Dr. Bui did not depart from the standard of care when she delivered S.Y. by cesarean section and that the evidence in the record did not show that Dr. Bui caused S.Y. any nerve injury. (Sutton Rpt. at 11, 14.) In addition, Dr. Sutton states that "[g]enetic testing can only test for abnormal DNA sequences within current medical knowledge and which are understood to be connected to pathologic conditions," and that "[i]t is possible that an as-yet undiscovered unifying diagnosis could explain S.Y.'s myopathy phrenic nerve dysfunction and global neurodevelopmental deficits that remain undiscovered." (*Id*. at 14.)

## LEGAL STANDARDS

### I.    FTCA

"[T]he FTCA defines the liability of the United States in terms of that of a private individual under the law of the state where the alleged tort occurred[.]" *Guttridge v. United States*, 927

---

[6] "The MTM1 gene provides instructions for producing an enzyme called myotubularin. Myotubularin is thought to be involved in the development and maintenance of muscle cells." MedlinePlus, https://medlineplus.gov/genetics/gene/mtm1/ [https://perma.cc/BG6D-ULUE].

F.2d 730, 732 (2d Cir. 1991); *see also* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . ..")*.* Here, the alleged tort occurred in New York and, thus, New York law applies to this action.

"To prove medical malpractice under New York law, a plaintiff must establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" *Potter v. United States*, No. 17-CV-04141 (AJN), 2020 WL 2836440, at *3 (S.D.N.Y. May 30, 2020) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)). "Moreover, 'it is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" *Id*. (quoting *Sitts v. United States*, 811 F.3d 736, 739 (2d Cir. 1987) (internal quotation marks and citation omitted)). "Thus, expert testimony is generally necessary to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." *Id*. (quotation marks and citation omitted).

**II.    Federal Rule Of Evidence 702**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). However, trial courts have a gatekeeping function, *see United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), and are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Nevertheless, Rule 702 "embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

"First, the Court must determine if a witness is qualified as an expert." *L.S. by Oliveira v. United States*, No. 16-CV-08763 (PMH), 2020 WL 13566228, at *1 (S.D.N.Y. Oct. 30, 2020) (citing *Nimely*, 414 F.3d at 397). "If the qualification standard is met, a court must next evaluate the methodology and reasoning underlying an expert's conclusions." *Id*. "Pursuant to *Daubert*, there are several factors a court may consider in determining the reliability of a particular methodology: (1) whether a theory or technique has been or can be tested, (2) whether it has been subject to peer review or publication, (3) its error rate and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether the particular theory or technique has gained 'general acceptance' in the scientific community." *Id*. (quoting *Daubert*, 509 U.S. at 593-94). "If the first two requirements are met, a court must examine the relevance of the proffered expert's testimony 'to determine whether the conclusions [he or she] draws will

aid the factfinder in answering the questions at issue in the case.'" *Id*. (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 350 (S.D.N.Y. 2005)).

"*Daubert* and its progeny . . . do not apply straightforwardly in the context of bench trials." *720 Lex. Acquisition LLC v. Guess? Retail, Inc.*, No. 09-CV-07199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014); *see also L.S. by Oliveira*, 2020 WL 13566228, at *2 ("A *Daubert* hearing prior to a bench trial can be unnecessary and inefficient."). "While standards for admissible evidence are not out the window entirely in a bench trial, all doubts at a bench trial should be resolved in favor of admissibility." *Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-CV-03796 (PKL), 2004 WL 1970144, at *5 (S.D.N.Y. Sept. 3, 2004) (internal quotation marks and citations omitted).

"The risk of the admission of irrelevant evidence in a bench trial is that it will prolong the proceedings; the risk of its exclusion is that the Court will [commit] error and make a decision on an incomplete record." *Howard Univ. v. Borders*, No. 20-CV-04716 (LJL), 2022 WL 3568477, at *7 (S.D.N.Y. Aug. 17, 2022). Thus, courts often reserve judgment on ruling on *Daubert* motions, *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 220-21 (S.D.N.Y. 2019), and later "deci[de] after the evidence is presented [at trial to determine] whether it deserves to be credited by meeting the requirements of *Daubert* and its progeny." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 457 n.1 (S.D.N.Y. 2007) (noting "[i]n the context of a bench trial where there is not a concern for juror confusion or potential prejudice, the court has considerable discretion in admitting the proffered testimony" and making any necessary *Daubert* determinations thereafter).

### III. Federal Rule Of Civil Procedure 56

Summary judgment is appropriate where the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Because the purpose of summary judgment is to weed out cases in which there is no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law, it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' including the admissibility of expert evidence." *Potter*, 2020 WL 2836440, at *3 (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal quotation marks, citation and alterations omitted)).

## DISCUSSION

### I. Motions To Preclude

The Government seeks to exclude, primarily as speculative and unreliable, the opinions of Dr. Luciani and Dr. Adler that excessive lateral traction during S.Y.'s delivery caused S.Y.'s injuries. (Def.'s 3/15/24 Mem., ECF No. 90, at 11-21.) Plaintiffs, in turn, seek to exclude, for largely the same reasons, the opinions of Dr. Spencer-Manzon, Dr. Rubenstein and Dr. Sutton that S.Y. has a genetic defect that caused his injuries.[7] (Pls.' 2/7/24 Mem., ECF No. 79, at 13-21.) The Court finds that the best path forward is to proceed to a trial where the experts will be cross-examined and the Court will be in a position to evaluate the experts' opinions in the context of a full record. *See Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 09-CV-05935 (MEA), 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) ("When the fact-finder is the court, expert evidence

---

[7] Plaintiffs also argue that Dr. Rubenstein and Dr. Sutton are not qualified in the field of genetics. (Pls.' 2/7/24 Mem. at 18-19.) As with Dr. Adler, discussed below, the Court will hear the testimony of these witnesses at trial before determining the extent of their expertise.

should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions.") (quotation marks and citation omitted); *see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07-CV-05804 (GEL), 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence; if [the moving party's] objections are well-taken, the testimony will be disregarded in any event."). Thus, the Court will determine at trial, not only what evidence is admissible but also how much weight, if any, to give to the evidence that is admitted. *See L.S. by* Oliveira, 2020 WL 13566228, at *2 (deferring until bench trial admissibility of expert evidence regarding cause of injuries).

The Government also moves to preclude Dr. Adler's opinions "on S.Y.'s damages, including his purported future special educational needs, employment prospects, and purported need for a supported living environment," because, according to the Government, Dr. Adler is not qualified to opine on S.Y.'s damages. (Def.'s 3/15/24 Mem. at 17-22; *see also* Def.'s 8/9/24 Reply, ECF No. 107, at 8-9.) "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted). Plaintiffs argue that Dr. Adler's training and experience as a pediatric neurologist make him qualified to give opinions regarding S.Y.'s prognosis with regard to education, employment and prospects for living independently. (Pls.' 6/27/24 Mem. at 24-25.)

The Court finds that a determination regarding Dr. Adler's qualification to testify regarding S.Y.'s special educational needs, employment prospects and purported need for a

supported living environment also is best reserved for trial. Although Dr. Adler is not a vocational or education expert, or a life care planner, he does have training in neuro-developmental disabilities and his knowledge and experience as a pediatric neurologist may qualify him to testify as to some aspects of S.Y.'s educational prospects and other future needs. (Pls.' 6/27/24 Mem. at 25.) The Court will hear Dr. Adler's testimony at trial before determining the extent of his expertise.

## II.     Government's Motion For Summary Judgment

The Government's motion for summary judgment is based entirely on the success of its motion to exclude Plaintiffs' expert testimony. (*See* Def.'s 3/15/24 Mem. at 24-25) ("This Court should grant the Government's motion for summary judgment because Plaintiffs have failed to adduce admissible expert testimony that could establishing the essential elements of medical malpractice or causation."). Because the Government's motion to exclude Plaintiffs' experts' testimony has been denied without prejudice, the Government's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preclude (ECF Nos. 81) is DENIED WITHOUT PREJUDICE and the Government's motion (ECF No. 89) is DENIED WITHOUT PREJUDICE with respect to the motion to preclude and DENIED with respect to the motion for summary judgment. No later than September 13, 2024, the parties shall file their Joint Pretrial Order in accordance with Section IV of the Court's Individual Practices. The trial of this case shall commence on November 4, 2024.

**SO ORDERED.**

Dated: New York, New York
       August 14, 2024

                                                              _____
                                                              STEWART D. AARON
                                                              United States Magistrate Judge